Good morning. Sarah Kane, Assistant Federal Public Defender on behalf of Appellant Russell Cullen. May it please the Court, I'd like to first address Mr. Cullen's challenge to the sufficiency of the evidence as to count to the knowing distribution count and then touch briefly on Mr. Cullen's challenge to the sentencing enhancement which was applied for an offense involving at least 600 images of child pornography. So this Court's 2018 decision in Carroll is dispositive in Mr. Cullen's case as to Mr. Cullen's conviction for knowing possession of child pornography and count to. Like the defendant in Carroll, the peer-to-peer software program at issue in Mr. Cullen's case had a default which means it automatically shared files with other users. And like the government in Carroll, the government in this case at trial impermissibly relied on indicia of knowledge which could be gleaned from the function of the peer-to-peer program itself to prove Mr. Cullen's knowing distribution of files. In other words, the government failed to establish that Mr. Cullen consciously authorized sharing or otherwise knowingly shared files with other users. I guess I'll just ask you the hard question about that issue. Didn't the jury see the welcome wizard or some recreation of that from which they could say, well, he made a decision to share these? Your Honor, yes. In the government's case in chief, they presented evidence through a law enforcement expert who had installed what they believe was the same version of SHERASA, the peer-to-peer program here. And the law enforcement expert took screenshots of the wizard which popped up on the law enforcement expert's screen. And the first page of the wizard tells users if you haven't used SHERASA or another peer-to-peer program before, this wizard can help you set up SHERASA. If you are a more advanced user, you don't need to use the wizard. And it also came through in testimony that you don't actually have to go through the steps of the wizard and there was no evidence in the government's case in chief that Mr. Cullen did, in fact, use the wizard. So while the wizard does, if you go through it, ask the user to choose which files to share, there's no proof that Mr. Cullen actually went through that process, which is, of course, what the government would have had to establish. I also would posit that the wizard is confusing in that it tells users you do not have to share content to use SHERASA. And using the phrase, choose which files to share, gives users the impression that sharing is an affirmative act, when in fact, it's the default. So if you do not go through the wizard or you read the wizard and you don't deselect files on page three of the wizard, SHERASA is automatically sharing every file as it's being downloaded and every file that has been downloaded until the user manually removes that file from the shared folder. So I think the wizard in itself is misleading to users and I also think there's no proof that Mr. Cullen, in fact, went through the wizard. So that is the substance of the government's case in chief as to Mr. Cullen's knowledge that his SHERASA program was sharing files. The government expert, Wiltsy, also testified that any file that's being downloaded, if the file's very existence is due to the peer-to-peer software, it is available to other users. So that just reinforces that SHERASA has a very significant default which requires an affirmative act by the user to overcome. And in addition, the sharing which happened here, the substance of count two, involved a law enforcement officer with particular software that connected to the SHERASA program at the IP address that was connected to Mr. Cullen and communicated to that computer, I would like an image file, which the law enforcement officer was able to download that single image. Now that's computer communication. There's no law enforcement officer communicating with Mr. Cullen who's sitting on his computer typing in the program. It's computer to computer alone. It also came through in the government's case in chief through its experts that the files can be shared through SHERASA when the user who's sharing the files is not present. It's a passive process. There is no process through which SHERASA tells the user, hi, someone's accessing your files. There's no pop-up window or noise that alerts the user that someone at that time is accessing and he is saw the image that was distributed because images and video files through SHERASA can be shared without the user having viewed that file. So it is truly a default. It's a passive process. There's certainly no evidence that SHERASA asked the user for permission before each file is shared. This might establish knowing distribution if the peer-to-peer program requires the user to authorize file sharing for each particular peer that requests a file. Carol also said that in some cases certain peer-to-peer softwares force users to acknowledge and accede to licensing agreements which explain the peer-to-peer process and then involve the user in setting up the shared file. That can be contrasted to SHERASA here where the user by default there is a shared folder and every single file that's downloaded by default goes into that shared folder. Let me ask you this. Are you challenging substantively the length of the sentence in this case? Yes, your honor. Mr. Cullen is challenging particularly he was sentenced to 240 months of imprisonment. This seems to me to be a run-of-the-mill case and when you peel it back there are no real extenuating circumstances. This looks like just all the other cases we see and you didn't really mention in the brief. These guidelines are stated conservatively unique because as you know, they didn't follow the process that Congress set out for vetting guidelines generally. These guidelines weren't vetted by the Sentencing Commission. A lot of these add-ons were simply included by congressional fiat without any study of their necessity or their efficacy and the add-ons by and large, some of the add-ons are inherent in like the use of a computer in every one of these crimes. He is looking at 240 months and I don't see you challenging the sentence on substantive reasonableness. Your honor, I think that we get to substantive reasonableness if this court finds, as Mr. Cullen has argued, that the district court incorrectly calculated his the government responded that error even if the court were to find that the court incorrectly found Mr. Cullen responsible for 600 or more images, that that error would be harmless. And I think your honor's points about the issues with the child pornography guidelines themselves and how they're not based on evidence is one of the many factors that I understand that the district court attempted to, he said, moot the issue on appeal and he said, if I'm wrong that I'm making, you know, I'm incorrectly applying this enhancement, I'm going to put on the record that I would give this sentence anyway. But I think that doesn't actually establish what harmlessness here for multiple reasons. One, as your honor mentioned, 240 month sentence is quite high and contrary to the government's argument that it's reasonable because it's in the guidelines if the court found that in fact the district court incorrectly applied this offense enhancement and instead went with the defense's position, then the offense level would have been reduced significantly such that Mr. Cullen's guideline range would have been 151 to 188 months. And there was nothing in the record to justify the court's 52 month upward variance were the court to find that it was an error to apply that offense enhancement. The district court also, while he did, the judge did say I would give this sentence no matter what, when he said that, he had actually not heard from any of the defense witnesses. There were multiple sentencing witnesses on behalf of the defendant and the court had not yet heard argument from either side as to sentencing. So . . . At what point did he make these remarks? He made them right as he ruled on the particular objection to the application of that sentencing enhancement. And as your honors are aware, the district court must consider all of the 3553A factors before deciding the appropriate sentence. So we . . . You just told me something I didn't realize. So he announced the sentence, then he heard the witnesses? Your honor, he announced that he would give the same sentence. You didn't know what it was at that point, but okay. But that can't be correct, right? Because he has to, the district court has to, the sentencing judge has to consider all the 3553A factors before deciding the appropriate sentence. And he hadn't done that yet because he hadn't heard from the sentencing witnesses. And he did impose the total sentence. He explicitly said a guideline sentence is appropriate here. He did decline to apply the downward variance requested by the defense, but he said, I'm applying a guideline sentence because the guidelines are appropriate here. And that suggests, of course, that an error in the guidelines could not have been harmless in this case. How long did the hearing go on, the sentencing hearing? After he made those . . . Yes. Timing-wise, I'm not sure, your honor. I wasn't the attorney there, but the transcript continues for several pages after he says, I would have given the same sentence regardless. We have appeals, I think, of sentences, I think we have three this week from the same judge. And I gather that's just a part of his colloquy every time he imposes a sentence, is that . . . That's my understanding. All right. Thank you. We'll hear from you again. Good morning. Morning. May it please the Court, Philip DeRosa on behalf of the United States. It had been my intention to walk you through all four counts of conviction, but I'm constrained by the fact that my opposing counsel only talked about the count two, the distribution count. So unless you have questions that you want to ask me specifically about the other counts, I'm just going to talk about the distribution count right now. Sergeant . . . Special Agent Elliot Graves of the FBI testified that he wasn't using any forensic software. He was just using his computer to look for other computers that were downloading child pornography. And on January the 14th, 2016, after having waited previously twice in interminably long download queues on Mr. Cullen's computer where he wasn't able to get the pornography that he was seeking, he finally was able to get an image on January 14, 2016. Now, the defendant testified that that image shouldn't have been there. It was recovered from his ACES laptop computer, and he says it shouldn't have been there because, you know, I reformatted my computer thousands of times, countless times, and there shouldn't have been any pornography on there. Well, there was. I mean, it was sitting in the share folder. And it's true, as Ms. Kane says, the share folder is a default system where files automatically go there. But he knew that those files were there. He knew that all of his child pornography files were in the share folder. Help me understand that. How did he know that? Okay, there's two main areas of the evidence that show how he knew that. First of all was the Welcome Wizard that Ms. Kane talked about. And there's nothing confusing at all about the Welcome Wizard. Now, Mr. Cullen testified that when I set up the Share AZA software on my computer, I went through the process of setting it up. That's what he testified to. And the process of setting it up is basically downloading it. And when you download it, you see the Welcome Wizard. It comes on, and it says this is the Welcome Wizard. And it specifically says that all of the files that you download are put in this share folder to share. There's nothing confusing about it. It's a notice that says that... Just to be clear, is that the government's best evidence of knowing intention to distribute? I think not. I think the best evidence is Mr. Cullen's testimony when he took the stand and he said, when I first got my computer in 2002, I had somebody show me how to set it up. And this person who showed me how to share files with others told me very specifically, don't ever leave files in your shared folder. Always take them out, because if you leave them there, anybody else can get them, can access them. And he said, he testified to the jury, from then on, I deselected, I always deselected my child pornography and any other files in my shared folder. He knew how to deselect. He told the jury that he did that. And the fact that he didn't deselect, when he knew how to do it and he was told the importance of doing it and he understood the importance of deselecting, he didn't do it. He left the files in his shared folder so that they could be accessed by other users. And that's exactly what CAROL... CAROL doesn't set up a test to tell you how to figure out whether somebody's distributing child pornography. It gives you a non-exclusive, non-exhaustive list of examples that point to distribution. But CAROL is interesting in that it says that, in CAROL, this court held that when a defendant knowingly places in, or leaves in, a shared folder, child pornography, that undoubtedly constitutes distribution. That's what the court said in CAROL. So that's the result that should obtain here. He either knowingly placed the child pornography in the shared folder, or he left it in the shared folder intentionally, because by his own testimony, he knew how to deselect those files, and he didn't do it. Let me ask you this. How can a responsible juror say that if I made a mistake, if I miscalculated this factor or that factor, I still would have given the same sentence? Why isn't that an abdication of judicial responsibilities? You're talking about the district court during sentencing, not the jury? Yes. Okay. First of all, this is a new issue that's being raised for the first time here at Oral Argument. This is not something that was brought up. It's a real interesting issue. It may be interesting, but it shouldn't have been brought up by the appellant, because this court has case law that says that you do not consider issues that are brought up for the first time. I'll deal with that. You answer my question. I will do that, Your Honor. I will do that. First of all, this guy got a break on the sentence. He got so much of a break. How so? Because the government had hundreds of examples of downloads that this defendant made over the course of an 18-month period, July 1, 2015 to January 14, 2015. These are different individuals? These are different victims, different child pornography victims, yes, sir. But the government didn't use all of those hundreds of files of child pornography to go into the guideline calculus. It only picked out 27 files. And the reason why the government picked out those 27 is because those are the ones that were 100% downloaded by the defendant. He had hundreds and even thousands of files, some of which had only been 37%, 92% downloaded, which you can still view them in that state. But the government decided, as a matter of being 100% downloaded, 27 times 75, which is the guideline calculation for video images, equals 2,000. You know, if the government had taken all those files, it would have been an unbelievable sentence. But it was very conservative. Now, the district court, you know, the district court is supposed to go through the guideline calculation first before applying 3553A. And that's exactly what the district court did here. And when the district court said, I would have given the same sentence, and I don't know if this judge, you know, Judge Martin, you know, you mentioned that this judge almost may do this as a knee-jerk reaction, but he doesn't. This sentence was very carefully tailored because he said . . . I didn't say that. I mean, he's a friend of mine. I'm sorry. I didn't mean to put words in your mouth, Your Honor. I don't know how many times this judge has made a keen finding. I think, if I'm not mistaken, I think we have three of these cases this week. But look at this one, because in this case, he very carefully tailors it. He says, when I'm telling you that I would have given the same sentence, that goes specifically to the five-point bump for 600 or more images. So what he's specifically saying is, it's the images that I'm going to say that I would have given the same sentence, even if I'm wrong. And I'm telling you that that's of no moment because the government could have charged hundreds and even thousands of more images. So it just seems to me that there's just no question in this case that the judge was being careful and reasonable about his guideline determination. If the court doesn't have any other questions, I think I've said about as much as I can say. Thank you. I appreciate you being here. It says five, but I think I have three. I'd like five, but I just... Your candor is noted. For the record, I don't agree with counsel for the government's characterization of the wizard. My understanding of the record is that the wizard does not tell the user that the default is the shared folder. Of course, I'll leave it to your honors, who are just as familiar with the record, to make that factual determination. As the government stated, their strongest evidence of Mr. Cullen's knowledge as to distribution comes from his own testimony. And that's a problem for the government, because the government cited, did not cite Carroll in its response, but did cite to Brown. And that's what the government is relying on to say, your honors can confirm this conviction because Mr. Cullen testified, and the jury can disbelieve his testimony. Of course, the jury can disbelieve his testimony. And that can be evidence of guilt, but it can't be the only evidence of guilt, which goes to his knowing distribution. And Mr. Cullen's position is the wizard in itself does not establish, does not meet the government's fundamental obligation, in its case in chief, to establish proof of an element. And here, the element is knowing distribution. And that this court cannot just throw in Mr. Cullen's testimony and say, well, even if the government didn't meet its fundamental obligation, let's infer that the jury disbelieved Mr. Cullen's testimony. I will also say that Mr. Cullen testified when he began to use peer-to-peer programs that a friend told him to deselect files, meaning don't leave files in a shared folder. That was, he was referencing a peer-to-peer program called LimeWire. So it's very important, and Carroll makes clear, Carroll happened after the trial in this case, so the government did not have the benefit of this court's wisdom in Carroll at the time of the trial. But in Carroll, the court has to look at each peer-to-peer program individually to decide how that program informs or doesn't inform the user and whether the setup of that program can in itself establish knowledge is a fact-specific inquiry. Finally, as to sentencing, the government mentioned hundreds of videos. I would ask the experts' testimony about what those logs actually contain, and the expert, Mr. Wiltsy, or Officer Wiltsy, testified that the CPC logs were not only child pornography. And so those logs reflect every single file that was available at the IP address connected to Mr. Wiltsy. And the government talks about 26 fully downloaded files, and nobody in the government's testimony, no witness, opened each of those 26 files to confirm that they were, in fact, child pornography. Thank you. Thank you very much for your presentation.